May it please the Court, Counsel. My name is Jean Bender and I'm the attorney for Mesa Communications Group, LLP, the appellant in this matter. And although Mesa has raised several issues on appeal, probably the most interesting issues involve the question of attorney's fees to the prevailing party. May I ask you something about that? Certainly. As I understand it, Oregon has American rule, not English rule, except that in attorney's fees, there's a statute that says in a contract case, attorney's fees are awardable. That's right. The Montana Code has a reciprocity provision in the Code. The problem that I have with your claim is that there wasn't any contract. Now, it's different if there's a contract but an adjudication that it's void or rescinded or something like that. But I don't get it. I don't see where attorney's fees can be awarded just because somebody makes an unfounded claim of a breach of contract. There was a contract, Your Honor, between Mesa's subcontractor, Pacific Northwest Infrastructure, P&I, and Dubray Land Services. And they claimed that P&I had entered into that contract as the agent of our client. We claimed that our client was not a party to that contract. And we prevailed on that issue at trial. So in essence, the contract was void for lack of consent on our part of our client. But there was actually a contract there in place. That's true, Your Honor. But I would point out that the last sentence or the last portion of a sentence in the statute says, and the prevailing party in any such action, whether by virtue of the express contractual right or by virtue of this section, shall be entitled to recover his reasonable attorney's fees from the losing party. And that's in the conjunctive. So that appears to be. . . There's the word such, though. Pardon me? The word such. In any such action. And Dubray did bring it. I think the statute has three predicates. First, there has to be a contract with an express right to attorney's fees, which we have. Secondly, a party to the contract must bring an action on the contract. We have that because Dubray Land Services did bring an action. And I agree with you. But I think the Montana court has used that last part of the statute where it says, and the prevailing party. Our argument would be that all the predicates have been met. The contract sets out a right to fees. Party to the contract having. . . Let me be real plain. As far as I can tell, Mesa is not a party to any contract with Dubray ever was. That's correct. So if I just read the statute cold, you lose. However, if there's a Montana case that says, don't read it cold, read it this way, of course I'll follow it. Because that's what Erie says I'm supposed to do. So point me to the case. Well, the Montana court has never addressed this exact scenario. But they have said in Bell v. Richards that under the reciprocity statute, contract rights to attorney's fees are reciprocal when the party from whom one is requesting fees had an express right to attorney's fees. And if Dubray had won on its contract claims, Dubray would have had an express right to attorney's fees under that contract. And I think without commenting on Rudio, the court in the later cases has said several times that the only predicate would be that the party from whom you are requesting fees has the right to have fees. Rudio has a statement in it that said if you're not a party to the contract, you don't get fees. No, it's never been overruled, but I think this new line of cases, starting with Bell, sets out a different rule. And it makes sense from a fairness point of view, because if you can sue somebody alleging they're a party to a contract for a long period of time, that party is forced to defend themselves. And then they mount a successful defense by proving they never consented to a contract. And I would agree with you if there were no case law saying that contractual rights can be reciprocal when the party from whom you are requesting fees is entitled to fees. And I think there are fairness reasons for that, because if I can just sue somebody alleging they're a party to a contract, and they would be liable and they would owe me fees if I won, and then I can walk away if I lose. I got this right. I thought DeGray was party to a contract with P&I. That's right. And Rudio says parties which are not parties to the original contract can in no event become entitled to attorney's fees, either under the contract or the statutory provision. And that's correct. And DeGray was never a party to any contract of any kind with Mason. That's correct. So it seems so logistic. Well, I'm saying these new cases, starting with Bell, have altered that rule, adding in this factor of being entitled to attorney's fees if the party from whom you're requesting fees has an entitlement to them. They've never overruled Rudio. Neither party would have had any entitlement if Mesa had defeated DeGray in every respect, or if DeGray had defeated Mesa in every respect. I can't see where there would be any entitlement. All you're citing authority for there is the rule of reciprocality, as far as I can tell. That's correct. But if DeGray had succeeded in proving that Mesa was a party to that contract, and that Mesa had breached the contract, which were the allegations, then – It seems like an if my grandmother had will, she'd be a bus kind of argument. I don't see it that way, Your Honor. If they succeeded in proving that Mesa was a party to the contract and had breached the contract, Mesa would have had to pay them attorney's fees and would have been liable on the contract. This is just a very odd fact pattern that's never been addressed by the Montana court. And it is – we think it's apparent from the line of cases that have developed subsequent to Rudio that although they don't overrule Rudio, they do allow fees if the other side could get them if they want. Could you talk a little bit about another issue that's on my mind? Sure. And that's the sufficiency of the evidence on interference with advantageous contractual relations, the tort claim. I realize that Mesa lost on that. Could you explain to me just in summary form exactly what the evidence is and why you think it's insufficient? There was very little contact. Mesa clearly was contracted or agreed with P&I that P&I would obtain sites for these cell towers and also be responsible for certain construction activities. P&I was free to go out and retain whoever they wanted to assist them in that regard. P&I retained DuBray. There are only two face-to-face contacts during the whole period of the project, which was a disaster. There are only two face-to-face contacts between anybody from Mesa and anybody from DuBray. The Beattie brothers, who owned P&I, brought Mr. Staten, the project manager for Mesa, into Laura Anderson's office at DuBray and introduced her, and they had approximately an hour meeting. Can you say the only? That's what bothers me here. I'm thinking a jury could infer pretty much anything, anything it wanted from this foliation of evidence, from the destruction of a year's worth of e-mails. A jury can figure, well, they wouldn't have destroyed the e-mail. They wouldn't have destroyed all that data unless the data would hurt them in the lawsuit. So the data must have been devastating in the lawsuit. That's usually, as I recall, I used to give a jury instruction in foliation cases that pretty much told the jury they could draw that kind of inference. And we did have that jury instruction, and the foliation issue also made it onto the verdict form where the jury found that there was no harm to DuBray. So why isn't the foliation enough to get past the sufficiency of evidence? Because they haven't identified any particular item that was foliated. How could they if all the evidence has been destroyed? I mean, if the jury can infer, gee, there was probably an e-mail in there where Mesa said, fired DuBray, purely speculative. But once Mesa destroys the evidence, juries are allowed to draw that kind of speculative inference. Well, the interesting thing about e-mail, though, is that there are two sides to it, and they obtain Mr. Beatty's side of the e-mail. Mr. Beatty never testified that Mesa directed him to fire DuBray. Mr. Beatty testified that Mesa took away sites and told him to tell DuBray staff to stop working on them. And Mr. Beatty would have been the other person who would have received these e-mails, and he did provide, I think, 500 and some e-mails. So there was no evidence of destruction of an e-mail with some direction to Mr. Beatty to fire DuBray. The reason that sites were removed was because the project was changing form, it wasn't moving fast enough, and at the end it was falling apart. And none of those reasons are directed at DuBray. Now, who is this Beatty fellow I forget? Mr. Beatty and his brother Mike, Jim and Mike Beatty, were the owners of Pacific Northwest Infrastructure. They were friends of the man who started Summit, the company that was going to hang its equipment on these towers. They were involved in the project before any of this. He and I, is that the outfit that had the convicted perjurer? No, that's mine. That's Mesa. Well, don't you concede that there was evidence presented to a legitimate purpose for the actions taken that were other than an intent to harm or interfere with the business? There was evidence presented to that effect, was there not, to the jury? Yes, there was evidence presented to the jury about the Summit bankruptcy and the fact that the project was... You made the claim that the evidence was insufficient to support the jury's findings. There was no evidence presented that Mesa had any intent to harm DuBray. There was evidence presented that the whole project was failing and that Mesa's actions in removing sites were taken because they didn't want to keep investing and building towers if there wasn't going to be an anchor tenant on their towers. Your position is that there was evidence and testimony at the trial that would allow a reasonable juror to find that Mesa's reassignment of several site acquisition sites contrary to the written contract was calculated to harm DuBray? No, that there is no evidence of any... None whatsoever? None. You know, when you take a position that there's no evidence in the trial, it took as long as this one did, it is really very hard to... because the evidence not only consists of testimony, but inferences that can be found, but testimony and evidence that have been received, to say that there was no evidence at all. Is that your position? It is. There's no evidence sufficient for a jury verdict on this issue? That's correct. There was no connection between DuBray and Mesa. There were the two personal contacts. There was some phone calls between Laura Anderson and Mesa's home office regarding lease language, but none of that rises to the level of creating an inference that Mesa somehow wanted to harm DuBray. And I think we posit in our argument on the evidentiary issues that because the jury was allowed to hear numerous times Mesa didn't pay, Mesa didn't pay, they probably thought Mesa didn't pay P&I so that P&I couldn't pay DuBray. And that was not the case. But under the contract theory, DuBray continued to argue that Mesa owed it money and Mesa didn't pay it any money. You can always save time for rebuttal. I will, if you have no further questions. Thank you. May it please the Court, I'm Herbert Pierce, counsel. And with me today is my partner, Jeff Oven, who also tried the case with me. And as a young lawyer, I wanted to give him an opportunity to be present and engage in this exercise today. And it's our pleasure to be here. I would first, especially based on some of the questions posed by the Court, explain the factual context of this entire relationship a little bit better because it is very confusing. This was a cell phone project, basically. Summit Communications had the licenses that are necessary in order to establish this network of cell phone, the cell phone operation. Summit knew P&I. They were Washington companies from the state of Washington. P&I were two good guys from the state of Washington, Jim and Mike Beattie, who was a two-person company. They really had no experience in the cell phone or tower business before. They were construction guys. Why did you hire them? Pardon? Why were they hired? Because they were friends with the owners of Summit, and then Summit wanted them involved. Then Mesa got wind of this operation through Ken Staton, and there was a dispute as to why he was hired. I think the evidence, one very good view of the evidence, the one I think the jury accepted because the Vice President lied about some telephone records and we caught him, impeached him on that issue, was that Ken Staton was hired because he had made the contact with Summit. And Ken Staton is the gentleman that Mesa hired who had the perjury conviction, who lied on his resume and was a pretty untrustworthy fellow. Mesa knew about that either before, around the time of, or immediately after hiring him. They kept him anyway. And the reason they kept him is because Mesa viewed this and the exhibits, the deal summaries that you'll see in this case of August and July of 2000 at SER 78 and 80 and in other places in the record demonstrate that Mesa thought this was going to be a big deal, potentially going to increase their tower ownership by a factor of two. It was going to double. I'm confused about something that you're not directing your remarks to, and let me focus you on my problem. As far as I can tell, Summit hired PNI because it was friends with a couple of PNI principals. It hired Mesa because the crook Staton worked for Mesa and had a contact at Summit. It's the way a lot of things get done. You hire people you know. Absolutely. There's nothing wrong with that right on its face. DeBray was not between either company and Summit. DeBray was one step down. PNI hired DeBray. Have I got this right so far? Yes, Your Honor. DeBray sues Mesa for tortiously interfering with his advantageous contractual relationship with PNI. Montana requires that Mesa's animus be directed toward DeBray. Now, I can see where Mesa would have an animus directed toward PNI. It wants the money. It wants the business. I have trouble understanding what the evidence is that Mesa cared one way or the other about DeBray. Well, it cared. Go ahead. I'll try and explain that. Mesa didn't want PNI in this situation, and the reason they didn't want PNI. Sure. No problem with that. Okay. It's an animus toward DeBray that I'm concerned about. Right. And the understanding with Summit was that if PNI didn't perform, then they could kick him out of the project. Yep. And it was certainly in Mesa's interest to get rid of PNI. Right. And one of the major ways, and this is what I believe the jury accepted, was to get at PNI was to put them in a position of non-performance with regard to site acquisition. PNI was not experienced in site acquisition, could not do site acquisition, specifically went to DeBray to do the site acquisition, and Mesa knew darn well if they interfered with that contract between PNI and DeBray, PNI would fail and they could thereby get rid of PNI. And the record is clear that Mesa, Staton, knew that DeBray was involved, knew that PNI needed help. That's all good enough. Right. However, it still shows only an animus toward PNI. Right. We want to get rid of PNI, and DeBray is incidental damage. Well, it's our position, Your Honor, that the evidence and the inferences that could be drawn from that were that they had to get rid of DeBray in order to get at PNI. Who knows why that was? And in Montana, the courts in Montana have defined in the statewide rental car case and the Taylor case this malice that is referred to as not typical malice or ill will. They've defined it as an intentional doing of a wrongful act without justification or excuse. They don't have to hate DeBray or dislike DeBray. Now, a lot of interference with contract cases involve those facts. But in Montana, that's not the standard under Montana case law. It defines the elements as just what I've said. The second point I want to make is that in this case, we've got an intentional destruction of documents, and there is an inference that the jury can draw as a result of that intentional. That was what I was kind of fastening on, as you heard, when I asked questions of your adversary. Why isn't her answer good enough that, well, the e-mails have a recipient and we had the recipient's e-mails? Well, he was one recipient. The point I wanted to make when I heard that response is, there is no way in the world Ken Staton is going to communicate with Jim DeBray as to the reason he wants to get rid of P&I's contractor, DeBray. He's doing it to get rid of P&I. There's no motive for him. He would never tell Jim Beattie why he wanted to get rid of DeBray. He'd tell Jack Rupert. He'd tell— That's exactly right, Your Honor. That's exactly what I believe happened, because the evidence shows that the site schedule was not prepared until July 25th of 2000, that there's an e-mail directly from Jim Beattie to Ken Staton saying, I need the lease that we're going to use in site acquisition from Mesa on July 29th, just a couple of days before he called Selby and fired DeBray, in essence. So I think the jury, the evidence is absolutely conclusive that that was a bogus excuse for doing what they did. And the jury, of course, the record is just full of all kinds of lies and inaccuracies and misrepresentation from Mesa's people. I don't think they believed Ken Staton about anything. I don't think they'd have believed his birth date if he'd have said it on the stand. And if that's the excuse he gave, and it's contrary to all the e-mails and documents in the case, I think they thought that since that was a lie, and Mesa came up with no other excuse for getting rid of DeBray, that there must have been a dastardly... Well, Ken Staton did call in that phone call with Laura Anderson and asked for the names of the agents. But in this business and with people like Ken Staton, you don't give the names of your agents out because they'll go directly to those agents and hire them and cut out DeBray. And he was upset about that, and that may well... No, Your Honor. No, actually, it occurred during that August 1st telephone conversation. And that's another thing that I'm sure impeached, again, for the umpteenth time, Ken Staton's credibility. You recall in the record, I asked Ken Staton, and they contended that they contacted Selby only after Laura Anderson wouldn't give him the names of the agents and she was uncooperative. Well, we found a phone record that had been produced by Mesa that showed that Ken Staton called Las Vegas, Nevada, where Dave Woelke, the manager for Selby, the company that they brought in to replace DeBray, seven minutes before he called Laura Anderson. And I asked him on the stand, of course, chasing these guys around and getting the truth was an enormous effort. I asked him, did Dave Woelke live in Las Vegas at that time? Yes. Did you make that phone call? Yes. And I established all that. And then in their brief, they argue that somehow that didn't establish that point. Well, they never asked Mr. Staton or put Mr. Staton back on the stand and said, well, was that your uncle in Las Vegas that you were calling? I mean, the clear inference was he called Dave Woelke, which I'm sure the jury absolutely believed he did, and he lied about it. And I don't know what they discussed, whether he said, well, look, if I get rid of DeBray, do you guys have time to come in and do this project? And then he called Laura Anderson. And I think the jury reasonably concluded that's exactly what happened. He set up DeBray, he got rid of DeBray, never wanted P&I on this project, had to interfere with the contract to get rid of DeBray and get rid of P&I, and that's exactly what he did. And as far as our not being able to prove what the e-mails were, well, I think the jury pretty well figured that since he'd been lied to enough that those e-mails likely would have produced the real reason for their interfering with this contract, whether he was upset with Laura Anderson because she wouldn't be bullied around by him. Who's Laura Anderson again? Laura Anderson was a project manager for DeBray. She's a local billings lawyer that Jim DeBray hired specially for this project. When he geared up and Mesa and P&I had come to them that Mesa actually was Your theory is basically his motivation would be to get the business and to replace P&I, but the means of accomplishing that would be to get rid of DeBray. Exactly. That's where he gets unanimous towards DeBray. Exactly, Your Honor, exactly. And then they, of course, strung us out over a period of weeks. We actually continued to work on this project throughout August. We found out that Mesa had hired Selby about three weeks later when we ran into them in the field. So Mesa didn't actually even tell us they were out there. So we'd worked a little bit before this. We'd purchased automobiles. We'd geared up for this project. We'd gone on and on. We were out in the field working for three solid weeks in August. They didn't even have the courtesy to call us and tell us they were kicking us off the job and giving 82 of the 106 sites that they had promised to us, that had been promised to P&I in writing on two occasions. You're getting deeper into the facts that I can understand. Yes. I have been working on this case for three years, just a few months. I understand the theory here. It's you cut out debris the way you might cut out whoever is providing steel to your competitor. You want the business. The competitor wants the business. They need steel. Whoever does the job needs steel. So you get the steel company to be unable to or unwilling to supply the steel, and then your competitor can't perform, and the principal has to hire you. The gray is the same thing. They need land acquisition, and one way or another, you interfere with the land acquisition. Right. How do you interfere with the land acquisition again? Well, you pull all the sites back from P&I and give them to another company. And the wrongful, unjustifiable conduct is that Ken Staten admitted they had a letter of intent that was signed by P&I that Mike Williams, the president of Mesa, said ruled, although it wasn't fully executed, ruled this relationship. There is an email from Ken Staten to Jim Beattie in the record that says, you will have all site acquisition activity. The letter of intent says you will have all site acquisition activity. Interestingly enough, the email from Ken Staten to Jim Beattie saying you'll have all site acquisition activity, of course, was one of the ones that were destroyed, one of the probably thousands of ones that were destroyed. We only were able to get that from Jim Beattie. I would like to state the point on the destroyed email. The only way to keep Gray unable to perform is by reducing the amount of work to the point where he can't perform it economically. That was the overall result, yes. And the fact that they yo-yoed us. They took away sites initially in the initial interference action in August. They didn't actually notify us, so we kept working out all this investment. They owed us all this money. They came back to us and said, well, you can work on 36 sites, so we continued to work on those sites. Then they pulled additional sites back. And then we were in a position of trying to cover and go get additional work in this business. It's a very capital-intense business. We have to finance our operation for 30 to 60 to 90 days before the money starts coming in. Basically, they had us by this time, and they were dangling us over the flame of the candle. And they came back to us and said, well, now do more work. Well, so then we're faced with the prospect, well, do we stop completely? Then they won't pay us at all. And then we might be in breach of contract with PM&I if we stop completely. So we honored our commitment. We did the right thing. And incidentally, in this whole case, there was never any inference that DuBray was ever dishonest or it was never impeached, its witnesses or its evidence, not once. So we went back to the contract. We worked. And then they pulled more sites from us. And then they wanted us to work more. So at one point, we got to the point of no return, basically, where we were totally dependent on Mesa honoring its promises, paying us for our work, not lying to us anymore. And then the ultimate happened. In December of that year, for the first time, they told us that, well, you know, Summit never had the money for this project. We were just sending you out there on the gold rush, basically, to get these sites, get these towers up, knowing the whole time of this contract Summit didn't have its money, didn't have its financing, that the project might fail. But they wanted to be first on the ground. But they wanted to do this on our money. And they didn't care if we went bankrupt doing it. And then they didn't pay us. We went under. I'd like to reserve some time, if we could, to respond, perhaps, to the reply. Since there was a reply. Is there a reply brief on the punitive issue? There is a cross-appeal on the punitives. Ordinarily, we don't do that. But I guess there's no harm in it. If it's acceptable. Otherwise, I could address it very quickly. Okay. You may. Thank you, Your Honor. Counsel. Your Honor, I think, with all due respect, we're back to your grandmother and the bus. There is no evidence in the record that MESA wanted to get rid of PNI. In fact, MESA and PNI stayed together in this project well into 2001, after it was clear that the most MESA was ever going to get out of this project was 15 cell towers in the whole state of Montana. They stopped leasing activity because there was not going to be anything to put on those leases. Summit was defunct. And so they continued to work with PNI on the construction of those 15 towers, and they stayed together throughout the project. And the only evidence presented was an email from Vice President MESA that says, if PNI doesn't perform, we will replace them. They didn't replace them. They added another leasing company so that the thing could move faster. There were reasons why these sites were withdrawn every time. One of the reasons was that Summit didn't have all the licenses that it needed to go up to northern Montana to Great Falls. So they put those sites on hold. I believe that's the 50 sites that they're talking about. And then they withdrew the 32 in western Montana to give them to another site acquisition company to move things along. They knew that DuBray was continuing to work in eastern Montana, and that PNI was actually doing some sites on their own. There was never a signed agreement between PNI and MESA. They fussed back and forth throughout the whole project, and they never had a signed agreement. They were working on an oral agreement. You know, I have a lot of trouble with this. It seems to me that when you have a company that destroys a year's worth of emails and has a convicted perjurer doing the deal, the jury is going to draw adverse inferences wherever they can. They're free to do it. And if there's any conceivable way that the evidence and inferences could be interpreted in favor of the verdict, you do it. The perjury conviction had to do with something that happened in Florida in 1994, 1995. So? The jury, it had nothing to do with this case. Yeah, but it means to the jury, he's a liar. The man is a liar. It may not have anything to do with this case. But knowing that a witness is established by the courts to be a liar, that's serious. Well, then I think the next step would be to say, and here's the lie he told us. But they never did point to any lie that Ken Staton told them. They had the very good fortune for a party in litigation to be opposing a convicted perjurer and destroyed evidence. Exactly. And if the jury had not found that DuBray was not harmed by the lost e-mails, that might fly. But the jury specifically found that DuBray suffered no damage as a result of the exfoliation claim. Maybe they thought they fixed the damage from the exfoliation. Possibly. I don't know what, I have no way of knowing what they thought. But clearly the evidence on the tortious interference is, the proof has to be that somehow they were trying to get rid of P&I, and they were getting rid of DuBray in order to get rid of P&I, but they never did get rid of P&I. They kept working with P&I the whole time. So there's really no connection there. And again, we're in the spot of being accused of we didn't pay, we didn't pay. MESA didn't have to pay DuBray. MESA paid P&I. P&I paid DuBray. The testimony at trial from the DuBray principals was that they looked to P&I for payment. They never sent a bill to MESA. They never asked MESA to pay them. There was an exhibit, I believe it was 34, that Mr. DuBray wrote to Mr. Beatty that said, I know you wanted MESA to contribute to this payment, but we're looking to P&I for payment. Counsel, why don't you save that minute and some seconds to respond on the cross-appeal. I will. Thank you. Thank you, Counsel. All you get is the remaining time on the cross-appeal. You don't start the clock over. Yes, Your Honor, I would concur. I just wanted to emphasize that, you know, the retrial in the standard case is something I think. . . I assume you want to retry compensatory damages as well, make it double for nothing bet? No, we don't, Your Honor. How can you not, under the Montana statute, about using the same jury for both? Well, I think this is a federal diversity case. I think the federal rules on retrial apply. I think Rule 59 allows a separate trial on various issues. To retry the whole thing in this case isn't, I don't think it's governed. . . Let's say that's right. Why would it have made any difference to the jury if this financial statement had been kept out? Here's my thinking. The financial statement you got in discovery showed $32 million. I think it was $32 million. I can't remember if it was net worth or assets, but it was $32 million. And the financial statement that was produced at the last minute, and arguably should not have been admitted, showed it was $25 million instead of $32 million. I can't see what prejudice there is from the $7 million difference, even if the jury bought it, because they said DeBray gets no punitive damages. Let me say this is correct, Your Honor. The point in this case is to apply not the difference in the amount. They never talked about the difference in the amount before. Because the representation, Your Honor, at that time was different than the net worth. If that was the only significance of this document, I wouldn't have really cared about it that much. But the surprise was that we didn't have an opportunity to read the document. We were doing some progress. Well, if the same result would have occurred, I have no reason to believe that there was going to be any evidence offered as a result of this financial statement that was different than just the value of the net worth. And that wasn't that big a deal. The significance was that because of the surprise itself, the failure to produce it in itself, the failure to talk about it in the future, I apologize, the failure to identify it as a commitment, and to stand up for counsel, to stand up and prove it. Because of the surprise itself, what? The surprise of a changed condition of urgent note in there by the author. Hold on. Finish the first, the basic sentence. The point was not the difference between $32 million and $25 million. The point was that because of the surprise itself, and then you interrupted yourself with a whole lot of parentheticals, and we haven't gotten to the end yet. Because of the surprise itself, what? The cautionary note by the author. That's the whole point of it. The cautionary note would allow Mr. Williams to get on his hands and say, our company is going down the tube. The future of the company is dark. There is no effective order. We're in dire financial straits. That's the surprise. Not the difference in the net worth. We've been living with that. That's why I didn't object to it when I listened. I didn't care about that. It's the dire future of the company. We're staring at the stock market. This was brought up at 939, and they say it was inadvertently. It wasn't. She didn't inadvertently leave it out of the briefcase. She didn't inadvertently not look at it. Counselor, your time is up. Thank you. I won't take much time. I do think that the Montana punitive damage statute applies. And the recent Winslow case, Justice Cotter's concurrence points out that, although it may be unfair, once the jury is dismissed, you cannot have a separate trial on punitive damages. You must have the same jury that heard all the evidence try the punitive damage issue. I'd also like to address the issue of surprise. Throughout this litigation, MESA never made a secret of the fact that it was very cash poor. When depositions were taken in New York, we didn't go. I told Mr. Pierce it was because the client didn't have the money to pay for it. So it should not have come as a surprise that MESA was cash poor. And under the Montana statute and under the concept of punitive damages, it's the defendant's condition at the time that punitive damages are to be imposed that must be considered. Thank you, Counsel. Debray Land Services v. MESA is submitted. Next is Miller v. Snavely.
judges: Kleinfeld, Graber, Rafeedie